STATE v. RONALD LEON HOLBROOK.

233 N. W. 2d 892.

September 19, 1975—No. 45267.

*C. Paul Jones,* State Public Defender, and *Rosalie E. Wahl,* Special Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Gary W. Flakne,* County Attorney, and *Vernon E. Bergstrom, Michael McGlennen,* and *David W. Larson,* Assistant County Attorneys, for respondent.

---

[3] Minn. St. 580.03.

[4] See, Minn. St. 580.23.

PER CURIAM.

Defendant was charged with unlawful sale of a controlled substance and unlawful possession of a controlled substance with intent to sell, Minn. St. 152.09, subd. 1(1), and a jury found him guilty of the charge of unlawful possession with intent to sell. Defendant, who is on parole from a maximum indeterminate term of 5 years' imprisonment, contends upon this appeal from judgment of conviction and denial of post-trial motion that (1) there was insufficient evidence of possession with intent to sell, and (2) admission of evidence of his prior imprisonment deprived him of a fair trial. We affirm.

The key witness against defendant at his trial was Beverly Johnson, a heroin addict acting as a paid informer for Metropolitan Area Narcotics Squad (MANS). Ms. Johnson, who has been addicted to heroin for 9 of her 27 years, supported her habit all those years by forgery and prostitution, and has served several prison sentences at Shakopee. In October 1973, while she was in the Ramsey County jail after an arrest on a forgery charge, Ms. Johnson agreed to work for MANS as an informer. During the period that she worked for MANS, a MANS agent was with her at all times.

Ms. Johnson testified that at about 10 p. m. on October 27, 1973, she received a telephone call from Barbara Bork, also a heroin addict, who said that she had received a call from a friend named Hobie (defendant), that he had some good heroin, and that he did not mind if she brought along Ms. Johnson. Ms. Johnson, who previously had met defendant at Ms. Bork's house, apparently agreed to come over to Ms. Bork's home.

After searching Ms. Johnson to make sure that she had no money or drugs on her person, one of the agents gave her six $10 bills and drove her over to Ms. Bork's home. He had been introduced to Ms. Bork on an earlier occasion as a man who lived upstairs in her apartment building. After picking up Ms. Bork, the agent drove them to defendant's apartment, let them off, and waited outside.

Ms. Johnson testified that defendant answered the door, introduced them to two young men named Bruce and Tom, and then proceeded to negotiate a sale of drugs to her (six "bindles" for $60).

After making the purchase, Ms. Johnson left the apartment and joined the agent, Ms. Bork remaining behind. Tests revealed that the six bindles Ms. Johnson purchased contained a mixture of heroin and procaine.

On cross-examination Ms. Johnson admitted that on some occasions when making purchases of controlled substances for MANS she had used some of the heroin she purchased and had not told the agents that

she had done this. She also testified that in a matter involving a different defendant, she had testified falsely under oath to a grand jury that she had purchased 25 bindles when in fact she had bought 30.

The evidence which defendant contends deprived him of a fair trial is testimony which the prosecution elicited from Ms. Johnson as follows:

"Q. Do you know if Barbara Bork and her husband William Bork are friends of the defendant?

"A. Yes, they are.

"Q. How close friends are they and how do you know?

"Mr. Murrin [defense counsel]: Objection, Your Honor. There is no foundation as to how she knows so she can't testify as to how they are friends, unless she testifies how she knows they are friends.

"The Court: Dual question as well.

"Mr. Brink [assistant county attorney]: I'll rephrase it, Your Honor.

"The Court: All right.

\* \* \* \* \*

"Q. [by Mr. Brink] How do you know they are friends, Beverly?

"A. I know that Barbara's husband is a good friend of Ronald's; only from Barbara Bork telling me this. I believe they have been in prison together at one time or something.

"Mr. Murrin: Objection, Your Honor.

"The Court: Well—

"Mr. Murrin: [Calls] for hearsay information.

"The Court: The answer is in, Counsel. It will have to stand."

Defendant called two witnesses. The first of these, William Vogel, who like Ms. Johnson had a felony record, testified that he was one of the two men with defendant the evening of October 27, 1973, and that the other one was Bruce Pepper. Vogel testified further that it was Bruce Pepper who dealt with the women and that he was "almost positive" that defendant did not participate in the sale. Questioned about his use of the phrase "almost positive," he said he would change that to "positive."

The second witness for defendant was Ms. Bork, who also had been convicted of a crime. Her testimony was that she had told defendant, who was a friend of her husband, to be on the lookout for heroin and that defendant had called her on October 27, 1973, and told her that there was someone in his house who had something in which she might be interested. Like Vogel, she insisted that Pepper, not defendant, had made the actual sale.

1. Defendant's argument that there was insufficient evidence of pos-

session of heroin with intent to sell is based upon the fact that the jury did not find him guilty of a sale of heroin. Defendant contends that this means that the jury rejected Ms. Johnson's testimony because only her testimony implicated defendant in the sale. Defendant contends that if this is true, then the conviction cannot stand because only Ms. Johnson testified that defendant had physical possession of the heroin. The state disagrees with the contention that the jury rejected Ms. Johnson's testimony and argues that in any event Ms. Bork's testimony regarding defendant's call to her, along with the fact that the sale occurred in defendant's apartment, provided the jury with sufficient evidence to convict.

We disagree with defendant's basic contention that the jury's verdict necessarily means that the jury rejected Ms. Johnson's testimony. There are several possible explanations, logical and otherwise, for the jury's finding defendant guilty only of the charge of possession with intent to sell. The jury in the exercise of its power of lenity could have believed all of Ms. Johnson's testimony and yet have convicted defendant of only the possession charge.[1] The fact that the jury requested additional instructions on sale indicates that possibly the jury was confused over the meaning of sale and for that reason acquitted defendant of that charge. Because of these possibilities, we cannot accept defendant's contention that the jury's verdict means it rejected Ms. Johnson's testimony. Being unable to presume that the jury rejected her testimony, we do not reach the issue of whether without her testimony there would have been sufficient evidence to convict.

2. In State v. Richmond, 298 Minn. 561, 214 N. W. 2d 694 (1974), this court dealt with a claim that the defendant should receive a new trial because the prosecutor elicited testimony from a witness that the defendant, who, as here, did not take the stand, had a prior record. In refusing to grant defendant a new trial, we stated:

"* * * In cases involving the erroneous admission of such evidence, this court has attached importance to whether the prosecutor intention-

---

[1] In State v. Corey, 182 Minn. 48, 233 N. W. 590 (1930), this court held that the trial court erred in failing to charge the jury that it could bring in a verdict of not guilty because in any criminal prosecution the jury has the power to return a verdict of not guilty even though contrary to the law and evidence. And, see, State v. Morris, 149 Minn. 41, 182 N. W. 721 (1921), upholding the jury's power to find a defendant guilty of a lesser offense even though the evidence is such that the defendant, if guilty at all, is guilty of the greater offense.

ally elicited such testimony. State v. Barness, 294 Minn. 507, 200 N. W. 2d 300 (1972). Of course, even if the prosecutor unintentionally elicits such testimony, as here, this court will reverse if it believes that the testimony prejudiced the defendant's case. Here, however, as in State v. Madison, 281 Minn. 170, 160 N. W. 2d 680 (1968), an intentional elicitation case, the evidence of defendant's guilt was so strong that it is very unlikely that the testimony played any substantial part in convincing the jury of defendant's guilt. We therefore hold that the error was nonprejudicial." 298 Minn. 563, 214 N. W. 2d 695, 696.

In cases such as this, it is often difficult to know whether the elicitation of the other-crimes evidence was intentional or not. Because of the difficulty of knowing this, we believe that whenever such evidence is elicited, defense counsel would be justified in asking the trial court for a hearing outside the presence of the jury for the purpose of determining whether the elicitation was intentional. Without such a record, we have no way of knowing whether the prosecutor had any wrongful intent. Certainly we cannot presume that the elicitation was intentional, and the trial court in denying defendant's post-trial motion stated that he had no reason to believe that it was intentional.

In determining that the admission of this evidence does not warrant granting defendant a new trial, we are influenced by a number of factors. First, defense counsel did not request cautionary instructions. Second, defendant waited until after the verdict to move for a mistrial. Third, the trial court, who had an opportunity to observe the reaction of the jury to this evidence, stated that he did not believe the evidence had a prejudicial impact. Finally, the fact that the jury convicted defendant only of the charge of possession with intent to sell suggests that the jury was not prejudiced.

Affirmed.