**STATE of Minnesota, Respondent,**

v.

**Franklin Delano JONES, Appellant.**

**No. 47492.**

Supreme Court of Minnesota.

May 26, 1978.

C. Paul Jones, Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary Flakne, County Atty., Vernon Bergstrom, David W. Larson and Lee Barry, Asst. County Attys., Minneapolis, for respondent.

ROGOSHESKE, Justice.

Defendant, charged with two counts of aggravated assault by intentionally inflicting great bodily harm, Minn.St. 609.225, subd. 1, was found guilty by a district court jury of one count of aggravated assault, as charged, and one count of simple assault, § 609.22. The trial court sentenced defendant to consecutive maximum terms of 10 years and 90 days for the two offenses. On this appeal from judgment of conviction, defendant contends (1) that there was as a matter of law insufficient evidence to support the aggravated assault conviction, (2) that the court erred in permitting a medical doctor to express his opinion as to whether fists could have caused serious bodily harm to one of the victims, and (3) that the trial court erred in allowing him to act as his own attorney without inquiring more thoroughly into whether the waiver of counsel was knowing, intelligent, and voluntary. There is no merit to the first two issues. Although we believe that the trial court should have discussed the matter of waiver of counsel more thoroughly with defendant on the record, we are satisfied that the record as a whole supports the conclusion that defendant's waiver of counsel was knowing, intelligent, and voluntary, and accordingly we affirm.

On the morning of August 23, 1976, defendant was released from the Hennepin County Workhouse, where he had been imprisoned pursuant to a conviction of assaulting a friend of his wife. Defendant, who had been having a dispute with his ex-wife, Judith, over his right to visit their 2-month-old son, called Judith and told her he wanted to see the boy. When she told him he could not, defendant responded that he was going to see him soon; however, defendant did not go to the apartment right away but spent the afternoon drinking.

At about 8 o'clock that evening, defendant again called Judith's apartment and told Sheryl Brandt, a friend of Judith's who answered the telephone, that he was going to see his son and that he was on his way. He arrived at Judith's apartment within minutes after calling. Judith, who had been out of the apartment when defendant arrived, returned and they immediately began arguing. Gloria Stroh, a neighbor of Judith's who was present with her children, also participated in the argument, telling defendant to leave. There was a dispute in

the evidence as to what precipitated the violence. Defendant testified that he went to pick up the baby from the crib, that Gloria Stroh jumped him from behind, and that he slapped her. He testified that Judith then grabbed him and Gloria hit him with a bottle, causing him to strike back at both of them with his fists. Sheryl Brandt, Gloria Stroh, and Judith all testified, however, that defendant slapped or hit Gloria and Judith first, and that he then attacked the women with his closed fists. While defendant was attacking Gloria, Judith ran down the hall and tried to get into Gloria's apartment so she could call the police, but the door was locked. Defendant ran after her, hit her, and dragged her back into the apartment. While defendant was chasing Judith down the hall, Sheryl picked up the baby and took him, along with Gloria's children, to another tenant's apartment.

The police arrived shortly after 8:30 p.m. Defendant was gone; Judith was dazed and had a broken jaw; Gloria was lying unconscious on the floor, her eyes swollen shut, her breathing shallow, and her pulse weak. Both were taken to Hennepin County Medical Center.

While the police were examining the scene and interviewing witnesses at the apartment, the telephone rang. Two officers talked with the party; both recognized the voice as defendant's. Defendant said, "Hello pigs. If you try to get me for this, I am coming back and kill both of you and the two girls."

Shortly after he was arrested, defendant called Sheryl Brandt from jail and told her that she should be grateful he had not beaten her and that she should straighten out the statement she had given police. He also told her not to tell anyone he had called.

Gloria Stroh, who was pregnant at the time of the beating, remained hospitalized for about a week. She testified that she almost suffered a miscarriage 2 weeks after the beating, that her left leg was numb for several weeks, that she had dizziness and headaches until just prior to trial, and that she still was experiencing a numbness in her teeth. Dr. Robert Rusnak, the neurosurgeon who had treated Gloria, testified that she received soft tissue damage to the face and neck region. The doctor was not asked his opinion as to whether she had suffered "great bodily harm," but he testified, over objection, that "fists are capable of producing serious and lethal damage to the body, and fists could account for her injuries." The reason the prosecutor wanted the doctor to give this opinion was to support a requested instruction on aggravated assault with a dangerous weapon, the weapon being fists. The trial court ultimately did not give that instruction.

Judith suffered a broken jaw, a cut lip, and a laceration above her left eyebrow. The otolaryngologist who treated her testified that none of her injuries was life-threatening but that if untreated her broken jaw could have left her permanently disfigured.

Defendant acted as his own attorney at trial, with John Ward of the public defender's office present at all times and acting in an advisory capacity. Ward was appointed to represent defendant on August 26, 1976. At the arraignment on August 31, 1976, defendant said that in previous criminal actions he had "even been forced to defend [himself] a couple of times because [he] just didn't seem to see eye to eye [with the lawyers]." On October 15, 1976, 3 days before trial, defendant told Ward that he intended to act as his own counsel, stating again that he had done so in prior cases. The decision apparently was contrary to Ward's advice. At the start of the *Rasmussen* hearing, Ward and defendant informed the court of defendant's decision as follows:

"MR. WARD: Your Honor, I have been appointed to represent Mr. Jones who is seated here in the courtroom next to me today, and as I have indicated to the court in chambers, Mr. Jones has indicated that he wishes to handle the trial of the matter on a pro se basis with me standing by.

"THE COURT: Is that correct, Mr. Jones?

"THE DEFENDANT: Yes, it is.

"THE COURT: Has Mr. Ward explained to you some of the problems that are involved in the trial of a criminal case and the defense of a criminal case?

"THE DEFENDANT: Like I am not a lawyer, Your Honor, but like—

"THE COURT: I know you are not a lawyer, that is why I am going to make some comments.

"THE DEFENDANT: Like I have been at a trial before where I was allowed to represent myself. But I feel that I know the truth, I know what happened, and I can go about bringing out the truth better than Mr. Ward can. I know what questions I want asked. I know all of this.

"Like I would have to take and have a book about this big (indicating) of questions that I wanted to get asked, where I can ask them from my head.

"THE COURT: Well, Mr. Jones, we have certain Rules of Evidence we would follow in the trial of any case, whether it be a civil case or a criminal case, you understand that. Lawyers are familiar with these Rules of Evidence and Rules of Procedure. Mr. Ward has been appointed to represent you and he will be here to advise you on any questions that have to do with questions of law, do you understand that?

"THE DEFENDANT: Yes, I do.

"THE COURT: You feel free to consult with Mr. Ward at any time if you feel that any evidence is being presented or questions are being asked that are not proper under the laws, or under the Rules of Evidence, do you understand that?

"THE DEFENDANT: (Nods affirmatively.)

"THE COURT: We'll be tolerant of your position. You are appearing pro se, and not having any legal training—I understand you have had no legal training?

"THE DEFENDANT: No, I haven't.

"THE COURT: But you understand whether you represent yourself or whether you have a lawyer, the court will insist that everything be done in a proper fashion. This is going to be a jury case and we expect you'll conduct yourself in a similar fashion as a lawyer would be expected to conduct himself representing a client, do you understand?

"THE DEFENDANT: Yes, I do.

"THE COURT: This court has no reservation about calling it to the attention of the lawyer if I think that the lawyer is doing something improper, I would do the same thing with you, do you understand?

"THE DEFENDANT: Yes, I do. I believe the court is here to see that justice is done. I believe the court and the prosecutor also is here for justice, not to allow or hinder justice being rendered. This is all I'm asking for, is that truth be allowed.

"THE COURT: Have you been advised before the trial of this case commences, and before the selection of the jury, that there are apparently certain questions or issues that are going to be determined by the court by way of a pre-trial hearing called a *Rasmussen* hearing. Has Mr. Ward informed you of that?

"THE DEFENDANT: Yes, he did.

"THE COURT: Do you feel competent to represent yourself in that proceedings with Mr. Ward's help?

"THE DEFENDANT: Well, like I would prefer that Mr. Ward give me some assistance on that.

"THE COURT: All right. Can you think of anything else, gentlemen?

"MR. FABER: I have nothing.

"MR. WARD: Nothing further at this time, Your Honor.

"THE COURT: All right. Are you ready to proceed on the *Rasmussen* issue?

"MR. FABER: Yes, Your Honor. With regard to the procedure in the courtroom, then, Your Honor, do I understand that Mr. Jones will be doing the questioning at this point of witnesses, jurors—

"THE COURT: You are nodding your head, Mr. Jones. That is your understanding and that is your desire?

"THE DEFENDANT: Yes, it is.

"THE COURT: With the exception you feel free to consult with Mr. Ward at any time with respect to any procedures that you feel in doubt about, and also with respect to any objections that might be made as to objections propounded by the prosecuting attorney or the submission of any evidence.

"THE DEFENDANT: Yes, Sir.

"THE COURT: In other words, he will serve as your legal adviser in these proceedings, and you feel free to call upon him at any time.

"THE DEFENDANT: Yes, I will."

At the start of trial, the court told defendant that he would be tolerant of defendant's lack of familiarity with the rules of evidence but reiterated that he intended to apply the rules. In fact, the court was tolerant of defendant's cross-examination of witnesses, which often related to irrelevant matters. At one point during a recess, after two prosecution witnesses had testified, a juror asked the bailiff if defense counsel should not assist defendant more. The court then asked defendant out of the presence of the jury if he wanted to continue acting as his own attorney, and he indicated that he did. The record shows that defendant sought and received Ward's advice a number of times during trial, and Ward argued a number of legal matters to the court on defendant's behalf. The trial court also advised defendant about certain legal procedures during the trial. Although the file does not contain a copy of the sentencing transcript, the court apparently stated at that time that "despite the lack of formal education on the part of Mr. Jones, that by and large he did a rather commendable job for a lay individual in representing himself."

■ 1. The jury found defendant guilty of aggravated assault by intentionally inflicting great bodily harm upon Gloria Stroh but found defendant guilty only of simple assault for the beating of Judith. Defendant's first contention is that there was as a matter of law insufficient evidence to support the guilty verdict on the charge that he committed an aggravated assault on Gloria Stroh. Specifically, defendant points to the fact that the neurologist did not corroborate some of Gloria's testimony about her injuries. He also compares Gloria's injuries to Judith's injuries and argues that there was no valid basis for the jury to distinguish the two.

We do not believe there is any merit to the contention that there was insufficient evidence to justify finding that Gloria suffered great bodily harm.

Minn.St. 609.02, subd. 8, defines "great bodily harm" as follows:

"'Great bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm."

Those who first attended Gloria found her unconscious and on the verge of shock. She had to be put in a "shock suit" for transfer to the hospital. She did not regain consciousness until the following day. She remained hospitalized for a week. She testified that 2 weeks after the attack she almost suffered a miscarriage and was prescribed bed rest. While there was no medical evidence tying this to the attack, it certainly was evidence which the jury could consider in determining whether she had suffered great bodily harm. She testified that her left leg was numb for several weeks, she had dizziness and headaches until just before trial, and she still had a numbness in her teeth at the time of trial. At the very least, Gloria's injuries would seem to fit within the phrase "other serious bodily harm."

■ The case for a finding of great bodily harm was also strong with respect to Judith, but the fact that the jury did not find that she suffered great bodily harm in no way affects its finding that Gloria suffered great bodily harm. We need not speculate as to the jury's reasoning. Suffice it to say, the jury in the exercise of its "power of lenity" was free to return a verdict of simple assault even if it believed

that Judith suffered great bodily harm. *State v. Holbrook,* 305 Minn. 554, 557, 233 N.W.2d 892, 894 (1975).

2. Defendant's second contention is that the trial court abused its discretion in permitting Dr. Rusnak to testify that "fists are capable of producing serious and lethal damage to the body, and fists could account for [Gloria's] injuries." We do not see the need to discuss this issue in any detail. The expert opinion would have had meaning only if there had been an issue as to who or what caused the injury or whether defendant's fists were "dangerous weapons." See, § 609.225, subd. 2. In this case, defendant admitted that he had struck Gloria "quite a few times" and that she "ended up unconscious on the floor." Defendant further admitted that the only real issue for the jury was whether he intended to do this and whether Gloria sustained great bodily harm. As we stated earlier, the trial court did not submit to the jury the issue of aggravated assault with a dangerous weapon.

3. The only issue in this case which merits detailed discussion is the issue relating to waiver of counsel. Two recent cases of this court have dealt with the issue of waiver of counsel, one in the context of a defendant of obviously questionable mental capacity who acted as his own attorney at trial, and the other in the context of an 18-year-old defendant of low intellect who pleaded guilty to a number of offenses without even talking to counsel.

In the first of these cases, *State v. Bauer,* Minn., 245 N.W.2d 848, 859 (1976), we stated that the responsibility for assuring an adequate waiver rests with the trial court and that when the mental competency of a defendant to waive counsel comes into question "it is incumbent on the trial court, independent of the issue of competency to stand trial, to conduct further hearings or inquiries into the competency of the defendant to make a knowing and intelligent waiver of his right to the assistance of counsel before permitting the defendant to proceed pro se." In that case, the question of the defendant's competency to waive counsel came into question during the pretrial proceedings, and yet the trial court failed to adequately inquire at that point into defendant's competency to waive counsel. In reversing, we noted that there were a number of reasons for thinking that if the trial court had inquired adequately, it might not have permitted defendant to proceed pro se.

■ The second case was *Burt v. State,* Minn., 256 N.W.2d 633 (1977), which raised the issue in the context of a guilty plea by a defendant without counsel. We recognized that a criminal defendant generally has a right to waive counsel and proceed pro se, but we reversed because the record as a whole inadequately demonstrated that the defendant's waiver was knowing and intelligent. We suggested that the trial court should have temporarily appointed counsel to consult with the defendant before accepting his plea, and we also suggested that the trial court should have inquired more thoroughly into the defendant's capacity to knowingly and intelligently waive counsel.

■ Neither of our prior decisions is directly applicable to this case. The trial court at the time of defendant's first appearance appointed a public defender to represent him. Defendant had the opportunity to talk with counsel about the advisability of representing himself at trial, and counsel apparently advised against it, as did the trial court. Also, the trial court, acting pursuant to Rule 5.02, subd. 2, Rules of Criminal Procedure,[1] ordered the public de-

---

1. Rule 5.02, subd. 2, Rules of Criminal Procedure, provides that even though a defendant waives counsel, the court may designate standby counsel to be available for assistance and consultation. A. B. A. Standards for Criminal Justice, Providing Defense Services (Approved Draft, 1968), § 7.3, requires the temporary appointment of counsel to consult with a defendant who has not consulted with one and wants to proceed without one. As we made clear in *Burt v. State,* Minn., 256 N.W.2d 633, 635 (1977), we strongly encourage trial courts to liberally use the authority provided in Rule 5.02, subd. 2, especially before accepting waivers. As stated in Potts, *Right to Counsel in Criminal Cases; Legal Aid or Public Defender,* 28 Tex.L.Rev. 491, 500, a defendant "needs the assistance of counsel to enable him to know

fender to be present at all times during trial. Defendant consulted with the public defender on numerous occasions, and he argued a number of legal matters to the court on defendant's behalf. Significantly, defendant has not sought a postconviction hearing at which he could introduce evidence that he was not mentally competent to waive counsel, and there is nothing in the record, as there was in *Bauer* and *Burt*, to indicate that he was mentally incompetent. We would have preferred that the trial court make a more penetrating inquiry on the record—the kind recommended in the *Burt* case—so as to ensure that defendant's waiver was knowing, voluntary, and intelligent. The trial court's failure to do so is understandable, however, because this case was tried before our opinion in *Burt* was filed. Also, as we indicated, there is nothing in the record on appeal to suggest that if further inquiry had been made, the waiver would not have been valid. Finally, the trial court was aware that defendant had consulted with the public defender and could reasonably presume that the benefits of legal assistance and the risks of proceeding without it had been described to defendant in detail by counsel. See, *Shackelford v. State,* Minn., 253 N.W.2d 149 (1977), holding that it may be presumed that a defendant represented by counsel at the time of entry of a plea of guilty had been advised by counsel of the rights he was waiving. See, also, *Henderson v. Morgan,* 426 U.S. 637, 647, 96 S.Ct. 2253, 2258, 49 L.Ed.2d 108, 115 (1976), supporting such a holding. Under all the circumstances, we are satisfied that the record as a whole supports the conclusion that defendant's waiver of counsel was knowing, intelligent, and voluntary.

Affirmed.

how great is his need of counsel." See, also, Mazor, *The Right to be Provided Counsel: Var-* *iations on a Familiar Theme,* 9 Utah L.Rev. 50, 76.