*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2367**

State of Minnesota,
Respondent,

vs.

Thomas Jerard Swenson,
Appellant.

**Filed January 12, 2015
Affirmed
Kirk, Judge**

Ramsey County District Court
File No. 62-CR-12-7825

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Elizabeth Lamin, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Rodenberg, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**KIRK**, Judge

On appeal from his convictions of first-degree assault, fourth-degree assault, and obstructing legal process, appellant argues that (1) the evidence is insufficient to support

his conviction of first-degree assault, and (2) the district court abused its discretion by not allowing appellant's counsel to cross-examine the victim about the status of her worker's compensation claim. We affirm.

**FACTS**

In September 2012, respondent State of Minnesota charged appellant Thomas Jerard Swenson with first-degree assault. The complaint alleged that on March 24, 2010, appellant assaulted St. Paul Police Officer F.R. after she responded to a 911 hang-up call at appellant's home. The state later filed an amended complaint adding one count of fourth-degree assault and one count of obstructing legal process.

The district court held a jury trial in July 2013. F.R. testified that on the date of the incident she was on routine patrol when she responded to a request from dispatch to check on the welfare of a man who called 911, screamed "you bunch of liars" into the phone, and then hung up. When she arrived at the house, F.R. rang the doorbell. An elderly woman, later identified as appellant's mother, F.S., answered the door and whispered to F.R. that appellant had been threatening her and her husband and drinking beer. F.S. allowed F.R. to enter the house and F.R. saw appellant standing in the middle of the room. Appellant's right hand was in his front pants pocket, a "fierce, angry" look was on his face, and he had a "squared" posture.

F.R. walked toward appellant and told him to take his hand out of his pocket, but appellant thrust his hand deeper into his pocket. Appellant swung his arm at her with a closed fist when she was within about an arm's length of appellant. F.R. pulled out her handcuffs and told appellant that she was going to handcuff him for her own safety, but

that he was not under arrest. Appellant swung at her again with a closed fist and grazed the right side of her face. F.R. stepped back and shot appellant in the chest with the Taser. Appellant removed the prongs of the Taser from his chest and charged at F.R., hitting her with a closed fist underneath her chin. F.R. felt like her head "exploded," she saw lights, and she flew into the door and then onto the floor on her stomach. Appellant kicked F.R. in the back of the head three or four times and then she blacked out.

Once F.R. managed to get up from the floor, she continued to struggle with appellant, using Mace and her police baton in the attempt to subdue him. She also requested assistance on her police radio. Appellant punched her in the head and chest, causing her to feel like she was going to lose consciousness. F.R. eventually chased appellant outside of the house, where another officer helped her handcuff appellant. F.R. testified that after the incident the right side of her head and face were tender and she could not put her teeth together. F.R. also complained that her ribs, back, and neck hurt, and she had bruises on both of her knees.

Two St. Paul police officers testified that they responded to F.R.'s request for assistance. Officer Kevin Clarkin testified that when he arrived at the scene he found appellant and F.R. outside the house. F.R. "looked like she just was in a fight," was sweating and leaning to one side, and kept saying, "[H]e kicked me in the head." Sergeant John Linssen testified that he arrived at the house after F.R. and Officer Clarkin had restrained appellant. He observed F.R. stand up and then stagger a couple of steps. F.R. appeared light-headed, was breathing very heavily, was shaking, and had red marks on her neck and the side of her face. Sergeant Linssen requested that medics respond to

3

the scene and they transported F.R. to the hospital because they were concerned that she had sustained a head injury.

F.R. testified that prior to the incident she was in good physical health, but afterward her life "absolutely turned upside down." She is no longer able to engage in her sewing hobby because she suffers from double vision, cannot stand the sound of the television, is very light sensitive, has difficulty reading, and suffers from chronic debilitating headaches. She testified that her physician administers 26 to 31 injections in her head every 11 weeks to treat her headaches, but she still suffers 16 to 18 debilitating headaches per month that make her unable to function. F.R. testified that her relationship with her husband has suffered. In addition, she testified that she is easily angered, has isolated herself from her children, cannot multitask, and is no longer able to work as a police officer.

Two of F.R.'s medical doctors and her psychologist testified during the trial about F.R.'s injuries. Marian Rubenfeld, M.D./Ph.D., F.R.'s neuro-opthalmologist, testified that she diagnosed F.R. with esotropia at distance and near, photophobia, and ambient focal disease. She testified that esotropia means that F.R.'s eyes are not properly aligned; photophobia means that F.R. experiences light sensitivity; and ambient focal disease means that F.R.'s sensory apparatus is off, causing her to feel dizzy and strange in certain situations. After F.R. continued to experience double vision, Dr. Rubenfeld diagnosed F.R. with monocular diplopia bilaterally, which is permanent double vision. Steven Stein, M.D., F.R.'s neurologist, testified that he diagnosed F.R. with a significant head injury and posttraumatic migraine-type headaches, which included symptoms such as

4

light sensitivity, nausea, and sound sensitivity. Dr. Stein testified that F.R. experienced migraines before the incident, but they became much more frequent and severe afterward and it is unlikely that they will resolve in the near future. Finally, Gary Goldetsky, Psy.D., F.R.'s psychologist, testified that F.R. reported pain, a decrease in cognitive functioning, low confidence, constant headaches, intolerance of light and sound, depression, and anxiety.

Appellant's parents, F.S. and M.S., testified in his defense. They both described a different version of the events, claiming that F.R. tripped and fell and hit her head on the doorjamb after she struggled with appellant.

The jury found appellant guilty of the three counts alleged in the complaint. The district court accepted the jury's verdicts and adjudicated him guilty of all three counts. This appeal follows.

## D E C I S I O N

### I. The evidence is sufficient to support appellant's conviction of first-degree assault.

Appellant challenges the sufficiency of the evidence to support his conviction of first-degree assault. In assessing whether the evidence was sufficient to support a jury's guilty verdict, this court "determine[s] whether the legitimate inferences drawn from the facts in the record would reasonably support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). We assume that the jury believed the state's witnesses and disbelieved contrary evidence. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). We will not disturb the jury's

verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

A person commits first-degree assault if he "assaults another and inflicts great bodily harm." Minn. Stat. § 609.221, subd. 1 (2008). "Great bodily harm" is defined as "bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm." Minn. Stat. § 609.02, subd. 8 (2008).

Appellant argues that none of F.R.'s injuries satisfy the definition of great bodily harm. We disagree. The evidence in the record is sufficient to support a conclusion that F.R. experienced "a permanent or protracted loss or impairment" of several neurologic and ophthalmologic functions, which satisfies the definition of great bodily harm. Sergeant Linssen and F.R. testified that F.R. was transported to the hospital immediately after the incident due to concerns that she experienced a head injury, and two of F.R.'s medical doctors and her psychologist testified extensively at trial about the diagnoses she has received as a result of her head injury, including permanent double vision and chronic headaches, among other things.

Appellant argues that F.R.'s injuries are insufficient to establish great bodily harm because she did not suffer any broken bones, injuries to internal or external organs, or permanent scarring. We disagree that these types of visible injuries are required to

6

establish great bodily harm. Instead, courts look specifically at the victim's injuries in each case to determine whether they satisfy the definition. Although several Minnesota cases discuss victims with head injuries in addition to other injuries, there are no Minnesota cases that discuss victims with injuries like F.R.'s injuries. But Minnesota cases have noted that head injuries resulting in loss of consciousness may constitute great bodily harm. *See State v. Stafford*, 340 N.W.2d 669, 670 (Minn. 1983) ("Arguably, 'great bodily harm' is inflicted if one knocks someone out briefly."); *State v. Jones*, 266 N.W.2d 706, 710 (Minn. 1978) (concluding that there was sufficient evidence to justify finding that the victim suffered great bodily harm when she was found unconscious and on the verge of shock, did not regain consciousness for a day, was hospitalized for a week, and almost suffered a miscarriage). Here, F.R.'s permanent neurologic and ophthalmologic injuries resulting from her head injury are at least as serious as the injuries sustained by the victim in *Jones*. *See* 266 N.W.2d at 710.

Accordingly, we conclude that the evidence is sufficient to support appellant's conviction of first-degree assault.

## II. The district court did not abuse its discretion by prohibiting appellant's counsel from cross-examining F.R. about the status of her worker's compensation claim.

Appellant argues that the district court violated his right to confrontation when it did not allow him to cross-examine F.R. about the status of her worker's compensation claim. "The district court has 'broad discretion' when it comes to the admission of evidence." *State v. Hall*, 764 N.W.2d 837, 841 (Minn. 2009). Appellate courts will only reverse a district court's evidentiary rulings if the court abused its discretion. *Id.* The

district court also has broad discretion to control the scope of cross-examination. *State v. Lanz-Terry*, 535 N.W.2d 635, 639 (Minn. 1995). But the district court's discretion is limited by the Confrontation Clause of the Sixth Amendment to the United States Constitution, which "guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." *Id.* at 640 (quotations omitted).

Under the Due Process Clause, "every criminal defendant has a right to fundamental fairness and to be afforded a meaningful opportunity to present a complete defense." *State v. Crims*, 540 N.W.2d 860, 865 (Minn. App. 1995) (quotation omitted), *review denied* (Minn. Jan. 23, 1996). This right includes the opportunity to present the defense's version of the facts to the jury. *Id.* The Confrontation Clause "serve[s] the same purpose, affording a defendant the opportunity to advance his or her theory of the case by revealing an adverse witness's bias or disposition to lie." *Id.* As a result, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *State v. Pride*, 528 N.W.2d 862, 865 (Minn. 1995). But a defendant does not have the right to introduce evidence that is irrelevant or unduly prejudicial. *Crims*, 540 N.W.2d at 866.

Here, appellant's counsel informed the district court during the jury trial that he intended to cross-examine F.R. about the details of a worker's compensation claim that she filed. He offered the following explanation for the relevance of the testimony:

> Apparently, the workers' compensation challenges that the injury that she sustained is either not substantiated or not the result of this occurrence and, secondly, that it is part of her motivation, in terms of making the statements and claims that she is, to justify her injury. I wouldn't go into it . . . other

8

than just a simple question or two regarding the fact it has been—as I understand, been unawarded as of right now.

In response, the district court stated:

> [A]s I understand workers' compensation claims, the issues in those cases are, one, did the injury occur in the course and scope of the applicant's employment—that's the first issue. The second issue, then, is the nature and extent of the claimant's injury.
>
> So, you know, on the first issue, did the injury occur in the course and scope of her employment, as I understand workers' compensation law, whether [F.R.] was assaulted or not would not be determinative on that issue. She's got to show that she was injured in the course and scope of her employment, and whether she was injured because she was assaulted or whether she was injured because, in the course of trying to restrain a disorderly suspect, she tripped and fell and hit her head. I don't know that that's what the evidence is, I'm just using that as an example. Either one of those would be sufficient, normally, to sustain a workers' compensation claim.
>
> So I'm trying to figure out the relevance of . . . her testimony here about that claim. In other words, she doesn't . . . need a criminal conviction in this case in order to prevail on a workers' compensation claim.

The district court concluded that F.R.'s worker's compensation claim was not relevant. But the district court stated that appellant's counsel could cross-examine F.R. about "the nature and extent of her injury" and any relevant preexisting injuries. After further discussion, the district court also determined that appellant's counsel could ask F.R. if she had filed a worker's compensation claim.

On appeal, appellant argues that evidence that F.R. filed a worker's compensation claim was relevant to show F.R.'s bias and motivation to testify that appellant assaulted

9

her. He contends that F.R. had a financial interest in testifying as she did because the success of her worker's compensation claim hinged on whether her injuries were attributable to a workplace injury or a preexisting injury. He also argues that she had a penal interest in offering testimony that was consistent with her statements in her worker's compensation claim. In response, the state contends that appellant proposed a fishing expedition and never provided an offer of proof regarding the status of F.R.'s worker's compensation claim.

We agree with the state. Appellant should have moved the district court before trial under Minn. R. Crim. P. 9 to obtain access to F.R.'s worker's compensation file or for the district court to conduct an in camera review of the file. As postured, appellant's counsel proposed a fishing expedition. Appellant's counsel did not provide the district court with any evidence of the status of the worker's compensation claim, and he admitted that he was not sure whether F.R.'s worker's compensation claim had been denied as a whole or in part and that he wanted to find out more about it. The record establishes that the district court carefully considered appellant's broad request before concluding that the evidence was not relevant. But appellant had the opportunity to show that F.R. was biased by cross-examining her about the nature and extent of her injuries and whether she had filed a worker's compensation claim. Therefore, we conclude that the district court did not abuse its discretion by not allowing appellant to question F.R. about the status of her worker's compensation claim.

**Affirmed.**

10