THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. IRA MIGHELL, Plaintiff in Error.

*Opinion filed April 18, 1912.*

CRIMINAL LAW—*when a defendant is not guilty of more than manslaughter.* One who, in resentment of an insult to a female relative, strikes the offending party with his fist without any intention of killing him but with the result that the party is knocked down and killed, is guilty of no more than manslaughter under section 145 of the Criminal Code, and it is error to convict him of murder.

WRIT OF ERROR to the Circuit Court of Lee county; the Hon. R. S. FARRAND, Judge, presiding.

JOHN E. ERWIN, for plaintiff in error.

W. H. STEAD, Attorney General, HARRY EDWARDS, State's Attorney, and W. EDGAR SAMPSON, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error was convicted of murder and sentenced to fourteen years' imprisonment in the penitentiary. He insists that the court erred in instructing the jury, that the argument of the State's attorney was improper and prejudicial and that the verdict was contrary to the evidence.

On Saturday evening, June 3, 1911, Emory Kincade, the deceased, was standing on the west side of the bridge across Rock river on Galena avenue, in Dixon, forty or fifty feet from the north end. Close to him on the south, in the order named, were Thomas Tyler, John Remington and Harry Tyler, a son of Thomas. All were close enough together to touch elbows. Thomas Tyler was sitting on the bridge railing with his feet on the outside; Remington was fishing with a rod and line; he and Harry Tyler were standing close against the railing, and all three were facing west. While they were there Miss Lulu Foster, a young

woman who lived on the north side of the river with her parents, passed them, going south. Kincade, who was a stranger to her, addressed her, saying that he was going to take her to the show. She answered, "No, you are not," and he said that if she was not careful he would take her to the show anyway. She told him he wanted to be careful to whom he was talking,—that she was a married woman. He then stepped out beside her, holding out a cigar, saying, "You will smoke my cigar, anyhow," when she passed him and went on. Near the south end of the bridge she met the defendant, who is her uncle by marriage, and told him that a man had insulted her at the north end of the bridge, narrating what had occurred. He asked who the man was, and she replied that she did not know but that he was standing there. They then walked back past the group of four men, with all of whom, except Kincade, the defendant was acquainted, and Miss Foster said, "That is him, on the end there." Miss Foster took the defendant's coat, which he had been carrying over his shoulder, and passed on. The defendant stepped up to Kincade, struck him twice and then went on north over the bridge, stopping to speak to Miss Foster, who came back on the west side of the bridge, past the men, and went on south across the bridge. Kincade, when he was struck, fell back against Thomas Tyler, who was next to him, made him lose his balance and almost knocked him into the river. Remington, who was next to Thomas, caught him, and Harry Tyler caught Kincade under the arms, supporting him and letting him sink down to the floor of the bridge. Kincade gasped once or twice. He was carried off the bridge at the north end, laid on the grass, and was dead. An autopsy the next day revealed a fracture of the left side of the base of the skull, extending inward from the articulation of the lower jaw to the foramen magnum, causing, by the rupture of the internal carotid artery, a hemorrhage, which resulted in death. The only external injuries discovered were an irregular cut entirely

through the upper lip, directly in front, the two central teeth in the upper jaw and one or two in the lower jaw being loosened, and some slight abrasions on the left side of the face, in front of the ear, which were insignificant.

The testimony as to the affray itself was given by Remington, the two Tylers and the defendant. Miss Foster was not called as a witness. Her home, at the time, was in Dixon, but the record discloses nothing in regard to her after that evening, except that she is now Mrs. Schrader. The account of what occurred between her and the deceased is derived from the testimony of the defendant as to what she told him when she met him on the bridge; that of a young man who was passing the group and saw one of the men holding out a cigar to Miss Foster and heard him say, "Go and tell your man, then;" and that of Remington, who says a young lady passed from the south and in a few minutes came back. His attention was attracted by the expression she used, "I want you to understand I am a married woman," or words to that effect. He looked around and saw Kincade holding out a cigar to her but heard nothing more. Thomas Tyler saw nothing. Kincade was standing close to him on his right, looking west and leaning on the railing with his elbows. The defendant came along, asked something about a cigar, and immediately two blows were struck which Tyler heard but did not see. Kincade fell over with the first blow, to the south, and against Tyler, unseating him, though he saved himself from falling into the river. He then saw the defendant crossing the bridge. Remington heard a disturbance and Thomas Tyler started to slip off into the river. Remington grabbed him, and then, stepping back, looked around and saw Kincade slowly sinking down, with his left arm over the rail and his head turned around toward the north-east. While he was in this position the defendant struck him with his fist in the neck, on the left side, saying, "I will teach you to insult a woman." Kincade did not fall to the floor but

was caught and held by Harry Tyler until told he would be better off lying down. The defendant walked away toward the end of the bridge, and Kincade lay there motionless until carried off. Harry Tyler heard a scuffle and a couple of blows. He turned around and saw the defendant hit Kincade on the left side of the head or neck or shoulder, somewhere. Kincade had his left arm over the railing, had turned nearly around, facing north-east, and had his right hand raised over his head. The defendant was right in front of him when he struck the last blow. Kincade began to sink down, and Harry caught him and laid him down. Harry spoke to the defendant as he passed with Miss Foster and the defendant spoke naturally to him. Miss Foster went on, and was nearly at the north end of the bridge when the blows were struck. She afterward came back past where Kincade was lying. Harry Tyler heard nothing said before the blows were struck, but afterward heard the defendant say he would teach him to insult women.

The defendant testified that when Miss Foster pointed Kincade out he stepped over and said to Kincade, "Partner, do you understand what ladies you are insulting on the street?" Kincade said, "What the hell do you care?" stepped back from the railing and struck the defendant in the stomach. The defendant then slapped Kincade back-handed with his left hand, on the side of the face, when Kincade threw his head down and made a lunge to strike the defendant, lost his balance, fell, and struck the railing of the bridge head first. He then straightened up with his left hand over the railing and his right arm thrown up to strike again, when the defendant struck him with his right hand on the collar bone, on the side of the neck. The defendant then walked away, took his coat from Miss Foster, and told her to go on over to town and do her business.

Kincade had on a new pair of shoes, just put on. The bridge railing had a lattice work of iron bars running diagonally, with a mesh of about six inches, and about a two-

inch top rail. At the place of the affray two sections of the railing were fastened together by means of three half-inch bolts passing through the perpendicular iron pieces which formed the end of each section, having nuts on the south side of the ends. A witness testified to finding drops of blood there on the floor of the bridge and some blood on the iron railing.

The three physicians who conducted the autopsy testified at the trial. From their testimony it appeared that a blow upon the mouth or upper jaw could not have produced the fracture of the skull without also fracturing the intervening bones of the face,—a condition which did not exist,—and that a blow on the neck in the region of the collar bone could not produce the fracture, but that a fall forward, striking on the tip of the chin, might produce it, or a blow at the angle of the jaw in an upward direction. One of the physicians said that in his judgment such a blow would cause a bruising of the soft tissues, but that nothing of the kind was discovered at the autopsy.

The defendant was thirty-seven years old, an electric lineman employed by the Dixon Power and Lighting Company. The deceased was employed as an engineer at the Roper furniture factory and had lived in Dixon a few months. The defendant was arrested about eleven o'clock on the evening of the homicide, by the sheriff and police sergeant Gaffney. On the way to the jail the sheriff testified the defendant asked Gaffney how bad he was in, and Gaffney told him the man was dead, whereupon the defendant said, "Good God! Is that so?" One of the officers asked him what possessed him to do that, and he answered, "Well, he was talking to the girl, and then he was always making slurring and belittling remarks about me every time he met me." Gaffney testified to these same statements, and also that he said, "I just gave him a little one with the left hand to straighten him up and then I hauled off and hit him." No one testifies to seeing any weapon or other

thing in the defendant's hand at the time of the striking, and he testified that he had nothing.

The theory of the prosecution is that the fracture of the skull was caused by the blow of the fist, which Remington and Harry Tyler saw delivered on the left side of the head or neck or shoulder and which the defendant says was on the collar bone. The theory of the defense is that the fracture was caused by the deceased's fall against the iron bridge railing when he started for the defendant but slipped and pitched forward, as the defendant testified. It is very clear that the latter theory is extremely improbable. If the deceased did fall he received the force of the fall upon his upper jaw, as his cut lip and loosened teeth show, and the expert evidence shows that such a blow could not have caused the fracture of the skull without also fracturing the intervening bones. That the point of the chin, upon which a hard blow might have fractured the skull, was not struck is shown by the fact that it was uninjured. It seems demonstrable that the fall upon the iron railing did not cause the injury. The only other possible cause was the blow on the side of the neck. It is true that the defendant says that this blow was on the collar bone, and that one of the physicians says that he, should think a blow sufficient to cause the fracture would also injure the soft tissues. It is conceded that a blow of sufficient force at the angle of the jaw, in an upward direction, would cause the fracture. Such a blow might be said to be upon the neck, and at any rate it is hardly to be expected that the witnesses of such a blow, seen in the confusion of an affray occurring in the dusk of evening, could be accurate within two or three inches of the exact spot where the blow fell. The deceased was falling backward, with his head turned to the right, and the defendant was in front of him. The blow with the right hand was in the general direction and general region indicated to produce the fracture. The conclusive answer to all argument that the fracture could not

have been so produced is that the man is dead, the fracture occurred and no other cause could have produced it.

No prejudicial error occurred on the trial, but the court should have granted a new trial for the reason that the evidence shows that the defendant was guilty of no more than manslaughter, and he should not, therefore, have been convicted of murder. Section 145 of the Criminal Code declares that "involuntary manslaughter shall consist in the killing of a human being without any intent to do so, in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: *Provided, always,* that where such involuntary killing shall happen in the commission of an unlawful act, which in its consequences naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder." It is manifest that the defendant had no intention to kill the deceased. The latter's insulting action toward his niece naturally excited the defendant's resentment and his protest. There is not the slightest reason, however, to suppose that he contemplated the defendant's death or even any serious injury to him. The fight which followed was not such an unlawful act as in its consequences would naturally tend to destroy the life of a human being under any conditions reasonably to be anticipated. The blow which did result in the death of the deceased, if unlawful, was exactly within the definition of involuntary manslaughter. For this reason the motion for a new trial should have been allowed.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*