# Illinois Official Reports

## Appellate Court

***People v. Axtell*, 2017 IL App (2d) 150518**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL S. AXTELL, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0518 |
| Filed<br>Rehearing denied | December 21, 2017<br>March 5, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 12-CF-2977; the Hon. Victoria A. Rossetti, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Vicki P. Kouros, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Lawrence M. Bauer, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Spence concurred in the judgment and opinion. |

## OPINION

¶ 1    After a bench trial, defendant, Michael S. Axtell, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) and sentenced to 30 years' imprisonment. On appeal, he contends, first, that his conviction must be reduced to involuntary manslaughter (720 ILCS 5/9-3(a) (West 2012)) because the State did not prove beyond a reasonable doubt that he knew that the act that caused the victim's death created a strong probability of death or great bodily harm to her (720 ILCS 5/9-1(a)(2) (West 2012)). Second, he contends that the trial court erred in admitting a statement that the victim made shortly before the fatal incident. Third, he contends that, if his conviction is affirmed, the judgment order must be corrected. We affirm the judgment as modified.

¶ 2    Defendant was charged with murdering Tammy Stone on the evening of October 4, 2012. At the time, they were residing in her house in Antioch with their son, Michael, and Jordan Johnson, Stone's son by another man. Defendant and Stone had a daughter, Meghan, who lived elsewhere. The indictment charged defendant with striking Stone about the body, knowing that his acts created a strong probability of death or great bodily harm to her.

¶ 3    The State moved *in limine* to admit several statements as exceptions to the hearsay rule. Only one is at issue here. According to the State, Jordan would testify as follows. On the evening of October 4, 2012, he heard Stone and defendant yelling. He then saw Stone lying unconscious on the kitchen floor. He returned to his room. Stone regained consciousness, ran into his room, and told him, " 'We need to find the phone or [defendant] is going to kill me.' "

¶ 4    As pertinent here, the State argued that the statement was admissible under the exception to the hearsay rule for spontaneous declarations because (a) there was an occurrence sufficiently startling to produce a spontaneous and unreflecting statement—*i.e.*, defendant's attack on Stone, (b) there was insufficient time for her to fabricate the statement, and (c) the statement related to the circumstances of the occurrence. See Ill. R. Evid. 803(2) (eff. Jan. 1, 2011); *People v. Williams*, 193 Ill. 2d 306, 352 (2000). Defendant argued that Stone's statement was not a spontaneous declaration, in part because it did not relate to a preceding occurrence. Without explanation, the court ruled that Stone's remark was admissible as a spontaneous declaration.

¶ 5    At trial, the State first called Meghan. She testified as follows. She was 21 years old and lived with her grandmother in Lake Villa, where she had resided on October 4, 2012. Defendant and Stone had never married; shortly after Meghan was born, defendant moved out of state. In 2011, he and Stone resumed their relationship, and he moved in with her, Michael, and Jordan.

¶ 6    Meghan testified that, on October 4, 2012, she, defendant, and Stone went to lunch at Chopper's Bar and Grill. After an hour, Stone and Meghan went shopping while defendant stayed at Chopper's. When they finished shopping, Stone and Meghan returned home. Defendant and Jordan were there; Michael was not. At some point, Stone asked Meghan to accompany her and defendant to Yvonne's, a restaurant in Ingleside, but she declined and went home. Later that evening, she and her friend Jenna Rice visited Joe Janusz in Round Lake Beach.

¶ 7        Meghan testified that, while she was with Joe and Jenna, she received a call on her cell phone from Stone. Stone was crying and said that "she got her ass beat" by defendant. Jenna drove Meghan and Joe to Stone's home. Meghan exited the car. Stone was standing outside. She had a black eye. Meghan entered the house through the garage, locked the door to the house, then passed through the laundry room and into the kitchen. She saw defendant, who was on the couch in the living room.

¶ 8        Meghan testified that she asked defendant why he had put his hands on Stone. Defendant said that "she grabbed his nuts." Meghan replied that he still had no right to hurt her. Meghan entered the living room. Defendant stood up and approached her. Stone, Jenna, and Joe entered, having been let in by Jordan. Defendant and Stone started arguing. Meghan told defendant to get his things and move out. Defendant pushed her; she pushed him down, pinned him to the loveseat, and struck him. Joe pulled her off. At Stone's request, Jenna called the police. Meghan, Jenna, and Joe walked to the garage area.

¶ 9        Meghan testified that she heard a loud thud and ran back into the house. From the kitchen area, she could see into the living room and down the hallway. Defendant was exiting Stone's bedroom, closing the door behind him. As he crossed Meghan's path, she asked what the noise had been. He responded, " 'nothing.' " Meghan opened the bedroom door. Stone was lying unconscious on the floor. Meghan shook her and spoke to her but got no response. Jordan, Joe, and Jenna soon entered. They put Stone onto the bed and turned her head to the side because "she was kind of choking on her spit" and having trouble breathing. Her eyes were rolling back into her head. Jenna called the police, and the other three left the room.

¶ 10       Jenna testified as follows. While she, Meghan, and Joe were at Joe's house, Meghan received a call and said that they needed to go to Stone's house. Jenna drove them there. As she pulled into the driveway, she saw that Stone was standing outside. Jenna, Meghan, and Joe exited the car. Meghan ran to the attached garage and inside the house. Jenna and Joe approached Stone. Stone had a bruise on her left cheek, with some swelling. Jenna eventually went to the back door of the house, where Jordan let her, Stone, and Joe in.

¶ 11       Jenna testified that, after going inside, she saw Meghan and defendant arguing in the living room. Stone pulled Jenna aside and showed her the swelling near her left eye and cheek. Jenna then saw defendant and Meghan fighting. Stone told Jenna to call the police. Jenna left as Meghan was pinning defendant. Outside, she called the police and remained on the line. She reentered the living room and saw that Joe had pulled Meghan off defendant. Jenna, Meghan, and Joe went to the garage. As she left, Jenna saw defendant and Stone enter the bedroom.

¶ 12       Jenna testified that, in the garage, she heard a loud thud. She, Meghan, and Joe ran back inside, where they saw defendant leaving the bedroom. He passed them and had a brief exchange with Meghan. Jenna and Joe entered the bedroom. Stone was lying on the floor. Meghan and Joe moved her to the bed and tried to get her to open her eyes and talk without success. Remembering that she had left her car running, Jenna ran out and saw defendant entering it. She reached in, turned off the car, and took the keys. As she turned around, she saw defendant walking away. She reentered the bedroom. Stone was still not moving. Jenna and Joe went outside. Soon, the police arrived.

¶ 13       Jordan testified as follows. On October 4, 2012, at about 4 p.m., he came home from school. Defendant was on the living room couch. Stone was in her bedroom. Jordan went to his room and played a game online. Defendant and Stone left the house and returned at about

- 3 -

8 or 9 p.m. Jordan was in his room with the door closed and a headset on. He could hear defendant and Stone arguing in "the other end of the house." Jordan then heard a loud thud from the living room. He left his room. Stone was on the floor next to the couch, crying. Defendant was at the other end of the couch, his feet near her head. He was not helping her. Jordan asked what had happened. He got no response and returned to his room.

¶ 14 Jordan testified that, shortly afterward, he heard yelling, followed by a second thud. He left his room. Stone was lying on the floor between the kitchen and the living room. Her head was about two feet from defendant, who was sitting in a chair. He was looking down at Stone but not helping her. Stone did not appear conscious. Jordan dragged her to the living room. He returned to his room, closed the door, and resumed his game.

¶ 15 Jordan testified that, perhaps five minutes later, Stone entered his room. Over defendant's objection, Jordan testified that she told him, " 'help me find my phone. [Defendant] is going to kill me.' " He found Stone's phone, and she called Meghan. When Meghan arrived, Jordan had returned to his bedroom. Hearing Meghan yell, he left his room. He saw Meghan tackle defendant and get on top of him; Joe pulled her off. Jenna called the police. Everyone but defendant and Stone went to the garage.

¶ 16 Jordan testified that, while in the garage, he heard "a loud thud from across the house." He, Meghan, Jenna, and Joe reentered the house. Defendant was walking away from the bedroom. Jordan and the others entered the bedroom. Stone was unconscious on the floor and was making sounds like snoring. She was not moving or responsive. Later, the police arrived.

¶ 17 Joe testified as follows. On the evening of October 4, 2012, he, Stone, and Jenna drove from his house to Stone's house. As Jenna pulled into the driveway, Stone was outside nearby. She had a bruise on her face. Meghan exited the car and ran inside. The door from the garage to the house was locked, so Joe, Jenna, and Stone went around the back, where Jordan let them in. Defendant and Meghan were inside. They were yelling at each other. Defendant started arguing loudly with Stone. He and Meghan got into an altercation; Joe pulled Meghan off defendant.

¶ 18 Lieutenant Michael Keller of the Lake County sheriff's office testified that, shortly after midnight on October 5, 2012, he arrested defendant, who was walking on the shoulder of Route 173. Detective Craig Somerville arrived and placed defendant into his squad car. Somerville testified that, on the ride to the station, defendant appeared intoxicated and said, among other things, "[W]hat would you do if somebody grabbed your nuts like Tammy did." At the station, defendant was questioned by Sergeant Kevin Eckenstahler. The interview was recorded.

¶ 19 Eckenstahler testified that he asked defendant what had happened. Defendant responded that, when he and Stone returned from Yvonne's, Stone started "talking shit." During a break, Somerville took several photographs of defendant. Eckenstahler and Somerville gave defendant a change of clothes and left the room. While alone, defendant continued to talk, calling Stone names and saying, " 'I need to figure this out, self-defense.' " Eckenstahler returned, told him that Stone had died, then left. Defendant expressed disbelief, cried, and said that he had done nothing. Eckenstahler returned and resumed the interview. Defendant said that Stone bruised the area of her left eye when she fell off a kitchen chair and landed on her face. The DVD of the interview was played in court.

¶ 20 Brian Dekind testified that, on the evening of October 4, 2012, he was a volunteer paramedic and was dispatched to Stone's home. As he entered, he saw a sheriff's deputy

performing CPR on Stone, who was lying face-up on the bed. The deputy and Dekind moved her onto the floor and continued CPR. An ambulance arrived and took Stone to a hospital.

¶ 21    The State called Dr. Nancy Jones, whom the court qualified as an expert in forensic pathology. On direct examination, she testified as follows. On the morning of October 5, 2012, she performed the autopsy on Stone. Afterward, she learned that Stone had lost consciousness at least once before the incident in the bedroom. A concussion could have caused the loss of consciousness, had it been sufficiently severe. A concussion is "a brain injury without physical evidence of an injury." It does not produce contusions or bleeding but disrupts the nerve impulses between the brain and the rest of the body. A person who sustains a concussion is more susceptible to another concussion, which can be more severe even with less of an impact.

¶ 22    Jones testified that the autopsy began with an external examination, which showed several blunt-trauma injuries. Stone had a fresh bruise with swelling around the area of the left eye and cheek, some abrasions on her left arm, bruising on her right shoulder, and minor impact injuries on her extremities. The bruising to her left cheek was not consistent with a fall.

¶ 23    Jones testified next about the internal examination. She found a "subgaleal hemorrhage," *i.e.*, bleeding on the left parietal region of the top of the scalp. Otherwise, the skull appeared normal; there were no fractures. Next, Jones removed the skull cap. She immediately noticed a "subarachnoid hemorrhage," *i.e.*, bleeding on the surface of the brain itself. The bleeding "feathered up along the side over the top of the brain," and the brain was swollen. She had the area photographed, then removed the brain. There was considerable bleeding on the interior surface of the brain, concentrated around the brain stem.

¶ 24    Jones testified that, to locate the source of the bleeding, she removed the brain completely and washed away the blood to expose the vessels at the base of the brain, known as the circle of Willis. The circle of Willis supplies blood to the brain. Two vertebral arteries that run up the spinal column meet at the brain stem to form the basal artery; this artery continues forward, with "different branches coming off the cerebral arteries, posterior cerebral arteries." The overall pattern is a rough circle with vessels going to the right and left sides of the brain. Jones discovered a laceration, specifically a longitudinal tear, in the right posterior cerebral artery. She had it photographed, then removed the circle of Willis so as to preserve it in formalin.

¶ 25    Jones identified and described six photographs taken during the internal examination. The photographs were admitted into evidence. Jones testified that one photograph (People's exhibit No. 59) showed the vicinity of the tear, which she had marked with scissors. She noted that the artery was intact at the point of the scissors and slightly onward but that the photograph showed the ragged and irregular portion of the artery where it was split. Jones testified that another photograph (People's exhibit No. 60) showed "the bony ridges that are present over the base of the skull which can cause lacerations or tears of the blood vessels at the base of the brain if the brain moves inside the skull."

¶ 26    Jones testified that a subarachnoid hemorrhage can be caused by the rupture of an aneurysm. An aneurysm is a weakening of the blood vessel wall, causing it to expand, and can result from turbulent blood flow, hardening of the arteries, or repetitive impact to the blood vessel. The first two kinds are the most common. The first normally occurs at branch points in blood vessels; the laceration to Stone's artery did not occur at a branch point. Jones

examined the circle of Willis for an aneurysm but found none. She did not notice any congenital defects in the vessels or anything unusual for a woman of Stone's age (40).

¶ 27 Jones testified that, once a person suffers the type of arterial laceration that Stone received, death is very rapid, especially with the great bleeding present in her case. Although Stone was intoxicated when she died, that played no role in her injury.

¶ 28 Jones testified that, to a reasonable degree of scientific certainty, Stone's death was caused by "a subarachnoid hemorrhage due to a lacerated cerebral artery due to blunt head trauma due to assault." She explained that, to bring about such a chain of events, the assault's impact must cause the head to hyperextend and rotate. With the head extending backward, the blood vessels stretch; with the rotation, the brain moves across the base of the skull and exposes blood vessels to the danger of running across the bony ridges at the base of the skull. A blood vessel can tear because it is stretched too far or because it makes contact with a bony ridge. It is quite possible for all of this to occur without leaving any external sign of trauma, such as bruising or a skull fracture. In Stone's case, the bruise to the left eye area and the parietal subgaleal hemorrhage were not related to the laceration of the cerebral artery.

¶ 29 Jones testified that, to cause movement of the brain that would make the posterior cerebral artery move over a bony prominence in the skull, "a significant act of force" is required. The force must also be applied "in just the right way so the head rotates and extends," but it does not always cause any external injury.

¶ 30 Jones testified on cross-examination as follows. She had performed more than 10,000 autopsies and had seen only three cases of the type of injury that Stone had suffered. Jones was not aware of any documented case of a traumatically caused laceration of the right posterior cerebral artery, but she had not searched the literature. The bruise to Stone's cheek could have caused the subarachnoid hemorrhage, but the cause was probably something else; in the previous cases, the fatal blow had been lower on the face. The bruising elsewhere on Stone's body was minor, and there was no other external evidence of the trauma that caused the cerebral artery to tear. Shown two photographs from the autopsy (Defendant's exhibit Nos. 8 and 9), Jones circled the location of the laceration on each one.

¶ 31 Jones testified that the rupture of a cerebral aneurysm is a frequent cause of subarachnoid hemorrhaging. An examination with the naked eye might not disclose a ruptured aneurysm.

¶ 32 Jones testified that she removed as much of the circle of Willis as she could and placed it into formalin with the other stock tissue. On March 11, 2014, she met with Dr. Shaku Teas at the Lake County coroner's office.

¶ 33 On redirect examination, Jones testified that, when she met Teas at the Lake County coroner's office, the circle of Willis from Stone's brain had become "all sort of twisted" from long storage in formalin, which causes tissue to harden and form knots. Jones reiterated that the cause of Stone's death was an assault or altercation that involved blunt-force trauma, resulting in the laceration of the cerebral artery. The laceration in turn caused the subarachnoid hemorrhage.

¶ 34 The State rested. Defendant's first witness was Dr. Anne Majewski, the McHenry County coroner, who testified as follows. She was familiar with Stone's case and was the keeper of the evidence. This included the stock tissue, taken at the time of the autopsy, that was preserved in formalin in a sealed jar. In January 2014, Teas removed, viewed, and photographed the stock tissue, then returned it to the jar. Later, it was transferred to the Lake

County coroner's office, where Jones and Teas took samples. The samples were sent to a forensics laboratory, which produced histology slides, and the tissue was returned to Majewski's office. The slides could be examined with a microscope.

¶ 35    The court accepted Jan Edward Leetsma as an expert in forensic neuropathology. On direct examination, he testified as follows. At Teas's request, he looked at some of the materials in the case, including photographs that Teas had taken and microscopic slides that she had provided. He made photographs of these slides.

¶ 36    Leetsma explained that a subarachnoid hemorrhage occurs in the space between the arachnoid membrane and the base of the brain. The most common causes of the bleeding inside the circle of Willis that leads to subarachnoid hemorrhages are aneurysms and arterial venous malformation. Head trauma can cause a subarachnoid hemorrhage, and if the impact sets the brain in motion, it can do so without cranial penetration. Aneurysms are a far more common cause of subarachnoid hemorrhages than are head traumas that do not penetrate the head.

¶ 37    Leetsma testified further as follows. Jones was undoubtedly correct that Stone had died of a massive subarachnoid hemorrhage. He had examined Defendant's exhibit Nos. 8 and 9 and could not detect any rupture in the right posterior cerebral artery. However, it can be difficult to see a longitudinal tear with the naked eye. Leetsma had also examined the slides taken of the artery and had not seen evidence of tearing. His examination of the photographs he had taken disclosed arterial injury. Abnormalities in the wall of the vessel existed, and there was also more arterial plaque than usual for a 40-year-old woman. These factors would heighten the risks of developing an aneurysm and having it rupture.

¶ 38    Leetsma testified that, because he could not find a tear or hole in the artery, he had to determine what caused the massive hemorrhage. He explained further, "And one has to then I suppose you could say place their bets with statistics and say probably the most common cause of fatal subarachnoid hemorrhage is especially in this age group aneurysm." Leetsma acknowledged, however, that he did not see any aneurysm.

¶ 39    Leetsma testified that, if trauma has caused a subarachnoid hemorrhage, he would generally look for fractures or some other major impact. The bruise to Stone's cheek was not the sort of impact he would expect to cause a subarachnoid hemorrhage. A great deal of force would have to be behind a single blow. Based on the medical literature, "[i]t would be most uncommon" for the right posterior cerebral artery to rupture and cause a subarachnoid hemorrhage.

¶ 40    Leetsma testified on cross-examination as follows. His report on the case was dated September 18, 2014. He was not involved in the autopsy or Teas's examination of the stock tissue, and he had never viewed Stone's brain directly. His report stated at one point, " 'I was not able to perceive any aneurysm in the specimen photographs [provided by Teas].' " The report concluded in part that there was no specific evidence that Stone had had an aneurysm.

¶ 41    Leetsma acknowledged that subarachnoid hemorrhages have resulted from single blows and that one blow can lacerate a cerebral artery without producing any fracture. Also, a study that he had coauthored included two fatal subarachnoid hemorrhages caused by single punches to the face.

¶ 42    After the court qualified Teas as an expert in forensic pathology, she testified on direct examination as follows. She had examined the autopsy report, photographs she had taken,

photographs the police had taken at the hospital, and police reports. In January 2014, at Majewski's office, she photographed the tissue specimens.

¶ 43    Teas testified that subarachnoid hemorrhages usually result from natural causes, most frequently the rupture of an aneurysm. Aneurysms cannot always be detected, as they can be too small or located in places that cannot be seen. Other natural causes include malformation of the arterial structure of the brain and arteriosclerosis. The most common cause of subarachnoid hemorrhages in 40-year-old women is a ruptured aneurysm.

¶ 44    Teas testified that she had read Jones's autopsy report and taken histology slides of those portions of the circle of Willis that were preserved. Examination with the naked eye did not reveal any laceration. Slides of various photographs were displayed in court. One slide was a photograph that Jones took while removing Stone's brain. Jones had used the photograph to show the right posterior cerebral artery. Teas testified that she could not see any laceration at the point that Jones had marked. Teas saw no laceration anywhere in the photograph.

¶ 45    Teas testified that the photographs of several cerebral arteries showed arteriosclerosis. The arteriosclerosis and the lack of trauma to Stone's body were consistent with an undetected aneurysm. Thus, Teas disagreed with Jones's opinion that Stone's hemorrhage had been caused by a laceration to the right posterior cerebral artery. Asked for her opinion of what caused Stone's death, Teas responded that "the most reasonable and common cause would be [a] ruptured aneurysm that left two subarachnoid hemorrhages [and] was not detected."

¶ 46    Teas testified on cross-examination as follows. Her report was dated September 13, 2014. She had not attended the autopsy or viewed the body in person. When she observed the partial circle of Willis, there was no laceration, but she saw no evidence of an aneurysm either. Her report stated that one way that an aneurysm can rupture is physical trauma from an altercation, such as a blow to the head with a fist.

¶ 47    Defendant rested. In argument, the prosecutor began by recapitulating the evidence. He mentioned, without elaborating, Stone's remark to Jordan, "he is going to kill me." He argued that defendant's statements while in custody showed that he realized that his acts had killed Stone and that she had not collapsed suddenly from a ruptured aneurysm. The prosecutor then focused on Jones's testimony, noting that she not only had testified to having seen an arterial tear but had photographed it and described it in some detail. Jones had also testified that it took a great amount of force to cause the head to move in such a way as to produce the tear. She had also looked for an aneurysm and found none.

¶ 48    The prosecutor focused on Jones's testimony that one concussion makes a second one more likely and means that less force is needed to produce an equally or more severe injury. Also, Leetsma had conceded that one punch to the head can cause a laceration to a cerebral artery.

¶ 49    The prosecutor noted that defendant had given the court the option of convicting him of involuntary manslaughter instead of first degree murder (or an acquittal). However, he contended, the evidence showed more than recklessness; it proved that defendant knew that his acts created a strong probability of death or great bodily harm to Stone. He had already inflicted great bodily harm by knocking her unconscious on the kitchen floor. He had steadily escalated the level of violence: the first time, Stone remained conscious; the second time, she lost consciousness; and the third time, she died. Defendant had known that the third blow, directed to Stone's head, was likely to cause great bodily harm in one or more of numerous

ways. The sound of Stone hitting the ground could be heard in the garage, at the other end of the house.

¶ 50 Defendant argued that there was no evidence of what trauma Stone had suffered in the bedroom; she had received the black eye earlier. Leetsma's testimony cast doubt on the likelihood of a subarachnoid hemorrhage without any external evidence of injury and on the likelihood that a laceration to the right posterior cerebral artery caused the hemorrhage. Moreover, there was conflicting evidence on whether Stone had suffered a lacerated artery. Stone's physical condition had put her at risk of rupturing an aneurysm.

¶ 51 Defendant contended that, even had the State proved that he had caused Stone's death by punching her and causing a subarachnoid hemorrhage, it had not proved that he had known that his act created a strong probability of death or great bodily harm to her. Defendant argued that no reasonable person would know that great bodily harm would result from a punch with a fist because that rarely happens, everyone is aware that it rarely happens, and case law has said as much. The previous incidents, even if they occurred as the State portrayed them, would not have made defendant able to foresee the effect of his later act: the State could only speculate that the punch in the kitchen had given Stone a concussion.

¶ 52 In rebuttal, the prosecutor contended that one punch can cause great bodily harm and that many people have suffered broken noses, concussions, or other serious injuries from single blows. Also, defendant and Stone had been yelling at each other just a few seconds before she fell, and it was unlikely that she suffered a ruptured aneurysm in that short time. Defendant's attempt to escape and hide was not the conduct of a witness to a fatal medical accident.

¶ 53 The judge found defendant guilty of first degree murder based on knowledge that his act created a strong probability of death or great bodily harm to Stone. The judge began by recapitulating some of the evidence, noting, but not emphasizing, Stone's statement to Jordan that defendant was going to kill her. The judge then noted the following.

¶ 54 While in custody, defendant admitted that he had hit Stone in the bedroom, and the evidence disproved his story that a fall off a chair had caused Stone's loss of consciousness in the kitchen shortly before. Jones had testified that Stone died of a subarachnoid hemorrhage that had resulted from a tear in her right posterior cerebral artery, which in turn had been caused by a blow from defendant. That blow had required a significant amount of force in order to cause the head to hyperextend and the brain to move so as to expose the artery to the bony ridges. Jones had found no evidence of an aneurysm. Although Leetsma and Teas disagreed with Jones, they admitted that they found no sign of an aneurysm. Thus, the judge credited Jones's opinion of the cause of Stone's death.

¶ 55 The judge then turned to the remaining issue: whether defendant had known that his act would create a strong probability of death or great bodily harm to Stone. The judge explained:

"We know she was found crying in the living room on the ground after a first thud. The second thud is the first time anyone saw any redness or swelling. She was not responsive. She was knocked out cold on the floor laying on the ground. Again, why Jordan did what he did in dragging her away leaving her alone, I don't know. It does not change the fact that *she was knocked unconscious, which to this Court is great bodily harm*. The victim's state of mind after regaining consciousness that [defendant] was going to kill her, this was not the fatal blow. We know that because

- 9 -

she was up walking around, talking, had the presence of mind to call her daughter. The smoking a cigarette [*sic*].

> We know again there was an argument between the defendant and his daughter. That after that argument [Stone] and *** defendant go into the bedroom. And by his own words she was yelling at him. That he just knocked her off the bed. He did not think he hit her that hard. He knocked her unconscious, and not just unconscious. It is what caused her death." (Emphasis added.)

The judge concluded that defendant had knowingly caused Stone great bodily harm and was therefore guilty beyond a reasonable doubt of first degree murder.

¶ 56    Defendant moved for a new trial, arguing in part that the court had erred in admitting Stone's statement to Jordan that defendant was going to kill her. The court denied the motion and later sentenced defendant to 30 years in prison. The written judgment cited the statutory subsection based on intent to kill or do great bodily harm or knowledge that the act will cause death (720 ILCS 5/9-1(a)(1) (West 2012)). After the court denied his motion to reduce the sentence, defendant timely appealed.

¶ 57    On appeal, defendant argues first that the evidence did not prove him guilty beyond a reasonable doubt. Defendant implicitly concedes that the trial court was within its prerogative in finding that his attack on Stone caused a rupture in her posterior cerebral artery that, in turn, caused the subarachnoid hemorrhage that resulted in her death. Defendant thus does not dispute causation but limits his argument to guilty knowledge. He maintains that the State did not prove beyond a reasonable doubt that he knew that the fatal blow created a strong probability of death or great bodily harm to Stone. See 720 ILCS 5/9-1(a)(2) (West 2012). Defendant acknowledges that the evidence proved beyond a reasonable doubt that the fatal blow was likely to cause death or great bodily harm to Stone and that he performed it recklessly, thus making him guilty of involuntary manslaughter. See 720 ILCS 5/9-3(a) (West 2012). Therefore, he contends that his conviction must be reduced to that offense and the cause must be remanded for resentencing.

¶ 58    Defendant relies primarily on opinions stating that, as a rule, death or great bodily harm is not contemplated as the natural consequence of blows from bare fists. See, *e.g.*, *People v. Crenshaw*, 298 Ill. 412, 416-17 (1921); *People v. Mighell*, 254 Ill. 53, 59 (1912); *People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 20; *People v. Nibbe*, 2016 IL App (4th) 140363, ¶ 27; *People v. Jones*, 404 Ill. App. 3d 734, 748 (2010). Defendant recognizes the exceptions to this principle, *i.e.*, (1) when the defendant inflicts multiple blows on the victim (see *Yeoman*, 2016 IL App (3d) 140324, ¶ 21) and (2) when there is a great disparity in size and strength between the defendant and the victim (see *People v. Brackett*, 117 Ill. 2d 170, 180 (1987); *Yeoman*, 2016 IL App (3d) 140324, ¶ 21). But he maintains that the evidence did not prove that he hit Stone more than once in the bedroom or that his previous attacks had any role in causing her death, and he contends that there was no proof of a great disparity in size or strength between Stone and himself.

¶ 59    The State responds that, under the circumstances, the judge properly concluded that defendant knew that his act created a strong probability of great bodily harm (although not death) to Stone. The State notes that, shortly before the fatal altercation in the bedroom, defendant had battered Stone twice, and the second blow had caused bruising and rendered her unconscious. The State notes further that the judge found that the loss of consciousness was "great bodily harm." Thus, the State reasons, having recently caused Stone great bodily

- 10 -

harm by a blow with his fist, defendant knew that a second blow to the weakened victim created a strong probability that she would again suffer great bodily harm.

¶ 60    For the following reasons, we hold that the State proved guilty knowledge.

¶ 61    In considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the State, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992). The trier of fact is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 62    To resolve defendant's claim, we must apply the statutory language. The statute requires knowledge of a "strong probability" of death or "great bodily harm." 720 ILCS 5/9-1(a)(2) (West 2012). "Strong probability" is "between the 'practical certainty' and the 'likely cause' and 'substantial and unjustifiable risk' of involuntary manslaughter." *Nibbe*, 2016 IL App (4th) 140363, ¶ 25 (quoting *People v. Davis*, 35 Ill. 2d 55, 60 (1966)). This definition is necessarily imprecise, but it is settled. The definition of "great bodily harm" *as used in the first degree murder statute* is, however, less settled. The parties cite several cases in which great bodily harm was an element of the charged offense (such as aggravated battery). These opinions discuss specific and limited instances of actual bodily harm but not potential bodily harm, which can include a wide, if not indefinite, range of results that never materialize. Thus, the opinions do not map neatly onto cases in which the fact finder must determine not whether "great bodily harm" occurred, but instead whether the defendant knew that "great bodily harm" was highly probable.

¶ 63    In *People v. Mays*, 91 Ill. 2d 251, 256 (1982), the supreme court construed the term "bodily harm" in the context of simple battery (Ill. Rev. Stat. 1977, ch. 38, ¶ 12-3 (now codified at 720 ILCS 5/12-3(a) (West 2016))). "[S]ome sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required." *Mays*, 91 Ill. 2d at 256. To define "great bodily harm" and determine whether the State had proved it in a given case, courts have started with *Mays*'s general statement and then considered (1) the construction of the added term "great" and (2) whether the bodily harm to the victim in the particular case rose to that level.

¶ 64    On the first score, courts have recognized the obvious: "great" bodily harm must be something more than the mere "bodily harm" required for simple battery. See, *e.g.*, *In re J.A.*, 336 Ill. App. 3d 814, 815-16 (2003); *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991). However, in itself, this truism is not helpful to defining *how* severe bodily harm must be in order to rise to "great." It appears to us that the court's statement in *Mays* was intended not to set a baseline for proving simple battery or to distinguish "bodily harm" from "great bodily harm," but only to differentiate between battery based on bodily harm and battery based on insulting or provoking contact. See *People v. Cisneros*, 2013 IL App (3d) 110851, ¶¶ 16-18; see also *Mays*, 91 Ill. 2d at 256. Thus, beyond reflecting a commonsense understanding of "bodily harm," whether "great" or not so great, *Mays* does not bear on the construction of "great bodily harm."

¶ 65    Moreover, there is another reason why opinions from cases in which the issue was whether the victim suffered "great bodily harm" are of little guidance in construing the term as it is used in the murder statute. These opinions could be read to hold that whether injuries

amounted to "great bodily harm" is a factual question that the fact finder has wide latitude to decide *even on a given set of facts or when the facts of the injury are not in dispute*. See, *e.g.*, *People v. Crespo*, 203 Ill. 2d 335, 344 (2001); *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14.[1]

¶ 66   Cases construing "great bodily harm" as used in statutes where it is an element of the offense provide uncertain guidance to the meaning of the same term as it is used in the murder statute. The statute requires the State to prove that a defendant knew that his act created a strong probability of great bodily harm. While the fact finder can properly decide whether specific conduct under specific circumstances created a strong probability of certain consequences—*e.g.*, lacerations, contusions, and bruises of whatever severity, etc.—the fact finder ought not decide whether given potential consequences satisfy the requirement of "great bodily harm."[2] It is not the job of juries and trial courts to construe statutes, subject only to deferential review by higher courts. But allowing the fact finder to decide whether an entire range of hypothetical results contains any that satisfy a statutory term is in effect to delegate the duty of statutory construction to the fact finder.

¶ 67   We therefore look beyond the foregoing set of cases and address those in which the murder statute was actually at issue. In particular, we discuss the authority that defendant cites for the proposition that, ordinarily, a single bare-fisted blow does not support a conviction of first degree murder as charged here.

¶ 68   In *Mighell*, the defendant confronted the victim, a stranger theretofore, and struck him with his fist. The blow caused a skull fracture, which in turn ruptured the victim's carotid artery and caused his death. The supreme court reduced the defendant's conviction of first

[1]In *Crespo*, the court stated that "what constitutes 'great bodily harm' to support a charge of aggravated battery is a question of fact to be determined by the finder of fact." *Crespo*, 203 Ill. 2d at 344. Whether the court meant to imply that the jury's or trial judge's finding of ultimate fact is entitled to deference even if the underlying historical facts are undisputed cannot be ascertained from the opinion. In support of its statement, the court cited *People v. Hadley*, 20 Ill. App. 3d 1072, 1077 (1974). *Crespo*, 203 Ill. 2d at 344. In *Hadley*, the testimony was conflicting, making the credibility of the witnesses crucial, so it cannot be read to hold that courts of review should defer to the jury's or trial judge's finding of ultimate fact based on undisputed historical facts. However, it appears that, in two of the opinions that *Hadley* cited, *People v. Newton*, 7 Ill. App. 3d 445, 447 (1972), and *People v. Polansky*, 6 Ill. App. 3d 773, 775-76 (1972), the pertinent underlying facts were not in dispute.

In *Lopez-Bonilla*, the issue was whether, at sentencing, the State had proved "great bodily harm" as a prerequisite to limiting the defendant's good-time credit. We did not set out the defendant's argument but noted only that he "addresse[d] the issue as one of statutory interpretation and ask[ed] [the] court to find a lack of great bodily harm as a matter of law." *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14. We then stated that the question was one of fact and that the State had introduced sufficient evidence of great bodily harm. *Id.* ¶¶ 15-18. The evidence appears to have been undisputed, but we might merely have been rejecting a proposed *per se* rule about the construction of the term. That we considered ourselves bound to decide whether the evidence was sufficient *could* be taken as implying that whether given injuries amount to "great bodily harm" is ultimately a question of law. But the opinion is not clear on this matter.

[2]As courts have long recognized, the application of a legal standard to a given set of facts is not a question of fact that implicates deferential review but a question of law that courts of review decide with no deference to the fact finder. See, *e.g.*, *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005); *People v. Lamborn*, 185 Ill. 2d 585, 590 (1999).

- 12 -

degree murder to involuntary manslaughter, noting the lack of proof that the defendant had intended to kill the victim and reasoning that he had not committed "such an unlawful act as in its consequences would naturally tend to destroy the life of a human being under any conditions reasonably to be anticipated." *Mighell*, 254 Ill. at 59.

¶ 69        In *Crenshaw*, in a spontaneous confrontation, the defendant killed the victim with a single blow to the side of the face or head. *Crenshaw*, 298 Ill. at 414. The supreme court reversed his conviction of murder and remanded for a new trial. The court explained that murder required malice, which would be presumed "where the act is deliberate and is likely to be attended with dangerous or fatal consequences." *Id.* at 416. However, the court concluded, "[t]he striking of a blow with the fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences." *Id.* at 416-17. Also, the disparity in the size and strength of the two men was not so great that "dangerous or fatal consequences" could reasonably have been expected from the blow. *Id.* at 417-18. Thus, the defendant might have committed manslaughter, but he did not commit murder. *Id.* at 417. We note that, although *Crenshaw*, unlike *Mighell*, addressed the likelihood not merely of death but also of "dangerous consequences," it did not define that term.

¶ 70        In *Jones*, the appellate court reduced the defendant's conviction from first degree murder to involuntary manslaughter. The case did not involve a fatal punch; the victim died of asphyxia after the defendant held him down on the ground by placing his foot between the victim's chest and head for approximately one minute. *Jones*, 404 Ill. App. 3d at 737-38. The court explained that a knowing-murder conviction required proof that a defendant "is consciously aware that his conduct is practically certain to cause a particular result." *Id.* at 742. In holding that the defendant's conduct did not meet this standard, the court relied partly on "[the] long-standing principle in Illinois that death is not ordinarily contemplated as a natural consequence of blows from bare fists," except "where there is a great disparity in size and strength between the defendant and the victim." *Id.* at 748.

¶ 71        In *Nibbe*, the defendant approached the victim on a sidewalk and punched him in the head, causing him to fall and hit his head on the pavement, suffering a skull fracture, which caused the victim's death. The appellate court held that the State did not prove knowing murder. The court found applicable "the principle that death is not ordinarily contemplated as a natural consequence of blows from bare fists." *Nibbe*, 2016 IL App (4th) 140363, ¶ 34. In *Yeoman*, the court reversed the defendant's conviction of second degree murder (which required proof of first degree murder). The defendant exited his car, confronting another driver who had exited his car, and punched him once in the face. The victim fell back, hit his head on the pavement, and suffered a fatal hematoma. *Yeoman*, 2016 IL App (3d) 140324, ¶¶ 4-5. The court relied on the bare-fist rule and found no exception applicable. *Id.* ¶¶ 20-22. In both *Nibbe* and *Yeoman*, the courts did not consider the meaning of "great bodily harm," and indeed, their recitation of the one-punch rule included the word "death" but not the phrase "great bodily harm."

¶ 72        Defendant contends that the foregoing opinions dictate the result here. He notes that there is no direct evidence of what happened in the bedroom—of the two participants, one was left unconscious and soon died, and the other did not testify—and no indirect evidence that Stone's fatal subarachnoid hemorrhage was caused by anything more than a single blow to the head with his bare fist. He also asserts that the State produced no evidence that he was greatly larger or stronger than Stone. Finally, he cites the medical testimony that the type of

injury that Stone suffered is extremely rare, at least when there is only one blow with a bare fist.

¶ 73    The State contends that the opinions that we have cited are distinguishable. Primarily, it argues, defendant's knowledge could be inferred from the injury that he had inflicted on Stone shortly before the fatal blow. The State notes that the judge specifically stated that defendant had already caused Stone great bodily harm by battering her into unconsciousness. Thus, the State reasons the judge could infer that, a short time later, defendant was practically certain that another punch would probably cause equally serious harm. The State notes that the law did not require the judge to find that defendant foresaw the *particular type* of great bodily harm that he actually inflicted. See *People v. Willett*, 2015 IL App (4th) 130702, ¶ 53.

¶ 74    We agree with the State that this case differs from those on which defendant relies in one crucial respect. In each of the cited cases, the defendant inflicted the fatal blow during his initial and sole confrontation with his victim, or at least the only one in which he used force. There was no basis for the defendant to infer that the victim had been weakened to the point where one blow with a bare fist could inflict great bodily harm. More important, there was nothing to put the defendant on notice that he had the ability to cause great bodily harm to the victim with one blow. Here, however, having already knocked Stone unconscious and bruised her, defendant punched her again.

¶ 75    Accordingly, we are compelled to conclude that the judge reasonably inferred that, when he delivered the fatal blow, defendant knew that it was highly probable that he would inflict as much bodily harm on Stone as he did the last time that he battered her. Common sense dictated the inference that she was no more able to withstand the third blow than the second one. More important, defendant knew that he had just inflicted bruising and unconsciousness with a single punch.

¶ 76    The opinions on which defendant relies did not prevent the judge from concluding that Stone's loss of consciousness was "great bodily harm" per the murder statute. These opinions do not define the term or even hint at a definition; indeed, *Jones*, *Nibbe*, and *Yeoman* cite the bare-fist rule with reference only to death.

¶ 77    We have found no Illinois opinion that addresses whether, or when, loss of consciousness by itself is "great bodily harm" under the murder statute or any other statute that uses the term. One opinion held that the infant victim's concussion was "great bodily harm" under the aggravated-battery statute. *People v. Morgan*, 62 Ill. App. 3d 279, 284 (1978). However, a concussion is not synonymous with a loss of consciousness, and the medical testimony did not allow a solid inference that Stone suffered a concussion in the second of the violent encounters.

¶ 78    We therefore turn to foreign authority for its persuasive value. There is support for the proposition that a loss of consciousness can be "great bodily harm." In *State v. Stafford*, 340 N.W.2d 669, 670 (Minn. 1983), a State appeal from a pretrial order, the issue was whether the State had demonstrated a reasonable likelihood that it could withstand a motion to dismiss the charge of felony assault in the third degree, which required proof of "great bodily harm." The State's offer of proof included testimony that the defendant had struck the victim, knocking her unconscious and fracturing her nose. *Id.* The Minnesota Supreme Court held for the State. It stated, "Arguably, 'great bodily harm' is inflicted if one knocks someone out briefly, as alleged here. Minn. Stat. § 609.02, subd. 8 (1982); *State v. Jones*, 266 N.W.2d 706 (Minn. 1978). We need not decide this because we are satisfied that if the state can establish

- 14 -

that defendant unjustifiably assaulted the victim and broke her nose, the state will be able to withstand a motion to dismiss \*\*\*." *Id.*

¶ 79 In *State v. Larkin*, 620 N.W.2d 335 (Minn. Ct. App. 2001), the defendant appealed his conviction of third-degree assault, arguing that the State did not prove that he had caused the victim " 'substantial bodily harm.' " *Id.* at 336; see Minn. Stat. § 609.223(1) (1998). The court affirmed. It noted that the defendant, a jail inmate, had choked a cellmate, causing him to lose consciousness until jailers called his name several times. This satisfied the statutory definition of " 'substantial bodily harm,' " which included " 'bodily injury \*\*\* which causes a temporary but substantial loss or impairment of the function of any bodily member or organ.' " *Larkin*, 620 N.W.2d at 336 (quoting Minn. Stat. § 609.02(7a) (1998)). The court noted *Stafford*'s statement that a loss of consciousness is arguably "great bodily harm," a higher standard, but ultimately relied on the plain language of the definition of "substantial bodily harm." *Id.* at 337-38.

¶ 80 *Larkin* also noted that, in *Jones*, which *Stafford* had cited, the victim had not merely been knocked unconscious but had been on the verge of shock, did not regain consciousness until the following day, and had suffered several other injuries and the Minnesota Supreme Court had concluded that her injuries as a whole met the statutory definition of great bodily harm, which included a catch-all provision for " ' "other serious bodily harm." ' " *Id.* at 337 (quoting *Jones*, 266 N.W.2d at 710, quoting Minn. Stat. § 609.02(8) (1996)).

¶ 81 Although the Minnesota cases are not closely on point and rely in part on specific statutory definitions, they (and the statutes that they cite) provide support for the proposition that a loss of consciousness *can* amount to "great bodily harm" as that term is used in the murder statute.

¶ 82 Persuasive authority is present elsewhere. In *People v. Fuentes*, 169 P.2d 391 (Cal. Dist. Ct. App. 1946), the court did agree with the defendant that he had not been proved guilty of committing an assault on the victim " 'by any means of force likely to produce great bodily injury.' " *Id.* at 392 (quoting Cal. Penal Code § 245 (West 1945)). The defendant had punched the victim in the jaw, knocking him down and rendering him unconscious. The victim regained consciousness at home shortly afterward, and he also suffered some bruising and a small laceration. *Id.* The court conceded that the use of fists could produce the type of force that the statute required for a conviction, but it then held that "[a] blow to the jaw sufficient to knock out the recipient is not \*\*\* ordinarily considered a great bodily injury for it is usual for the victim to recover consciousness and the use of his normal faculties within a short time[,] which [the victim] did." *Id.* at 393. Also, the cut and bruising to the head were too slight to show that the defendant's punch had been likely to cause great bodily injury. *Id.* at 394.

¶ 83 *Fuentes* would militate strongly in favor of defendant here—except that it has been thoroughly repudiated. In *People v. Muir*, 53 Cal. Rptr. 398, 399 (Dist. Ct. App. 1966), the defendant punched the victim once, causing her to lose consciousness for a short period and to have limited recall of the events shortly after she returned to consciousness. He was convicted of assault by means of force likely to produce great bodily injury (the same offense as in *Fuentes*). On appeal, he argued that the trial court had erred in not giving the jury an instruction based on *Fuentes*. *Id.* at 401. The court of appeals disagreed. It stated flatly that "the apparent holding [of *Fuentes*], that a blow to the jaw sufficient to knock out the recipient cannot prove such an assault, is wrong." *Id.* at 401-02. The statute prohibited an assault by

force likely to produce great bodily injury, even if it did not in fact do so. Whether the force used in a given case met this standard was primarily a question of fact, and "[a] rule which declares as a matter of law that the force behind a blow to the head which causes unconsciousness [is not such a force] may have had some value in the more robust past *** but it is plainly contradicted by everyday experience and is *** bad law." *Id.* at 402; see also *People v. Rupert*, 98 Cal. Rptr. 203, 206 (Ct. App. 1971) (agreeing with *Muir*).

¶ 84   The California opinions provide considerable support for the finding that defendant's second blow to Stone, which rendered her unconscious and also caused bruising and swelling to the area of her left eye and cheek, resulted in "great bodily harm," thus strengthening the inference that, when defendant battered Stone shortly afterward in the bedroom, he knew that there was a strong probability of inflicting great bodily harm then as well. We see no meaningful difference between section 9-1(a)(2)'s "great bodily harm" and the California statute's "great bodily injury." In the California line of cases, it appears that defining "great bodily injury" was left primarily to the courts; so too here. We see nothing in our jurisprudence that would prevent the adoption of the sound reasoning of *Muir* and *Rupert*.

¶ 85   To be clear, we do not adopt a *per se* rule that any loss of consciousness, no matter how temporary, always amounts to "great bodily harm." We do, however, repudiate any *per se* rule to the contrary. Most important, we hold that the trial court properly concluded that Stone had suffered "great bodily harm" from the second blow and that this conclusion amply supported the crucial finding that the State proved defendant's guilty knowledge in connection with the fatal third blow.

¶ 86   We also note that, in addition to the loss of consciousness, the second blow produced substantial swelling and bruising that lasted through the time of the fatal strike. To the extent that the loss of consciousness might not be considered "great bodily harm" in itself (a conclusion that we need not reach), the combination of the loss of consciousness and the physical disfigurement did so.

¶ 87   Moreover, the weakening of Stone by the second blow was an additional reason for defendant to realize that a third punch was highly likely to cause equally severe if not even worse harm. Less than an hour passed between the two attacks. Although Stone had regained consciousness, it was reasonable for the trial judge as fact finder to infer that the severity of the second blow had clearly weakened Stone and that defendant was aware of as much.

¶ 88   For the foregoing reasons, we hold that the State proved defendant guilty beyond a reasonable doubt of first degree murder.

¶ 89   Defendant's second argument on appeal is that the trial court erred in admitting Stone's statement to Jordan, " '[defendant] is going to kill me.' " Defendant contends that the statement did not meet the third requirement of the spontaneous-declaration exception to the hearsay rule: that it relate to the circumstances of the startling occurrence. See Ill. R. Evid. 803(2) (eff. Jan. 1, 2011); *Williams*, 193 Ill. 2d at 352. Defendant reasons that Stone's statement related only to what he would do sometime in the future.

¶ 90   The admission of evidence is within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion. *People v. DeSomer*, 2013 IL App (2d) 110663, ¶ 12. A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court. *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 47.

¶ 91 We cannot say that the trial court abused its discretion. Although the statement explicitly referred only to defendant's future conduct, it implicitly related to his very recent past conduct. Had Stone merely fallen off a chair, as defendant later claimed, she would not have told Jordan that defendant was going to kill her. Her prediction tended to prove that defendant had just committed an act of violence against her. Thus, the remark related to the startling event that preceded it, and it was relevant to prove a contested and important fact.

¶ 92 In any event, even if we could say that the court abused its discretion, we would conclude that the error was harmless. The evidence overwhelmingly proved that defendant battered Stone in the kitchen and not that she fell off a chair. In any other respect, there was little if any danger that the remark would unduly prejudice defendant. That it might have unfairly implied that defendant had intended to kill Stone was not crucial here. The State did not contend that, when he administered the fatal blow, defendant intended to kill Stone. Instead, it contended only that he knew that his act would create a strong probability of death or great bodily harm. The judge accepted that argument, on the basis of the medical evidence and defendant's prior batteries of Stone. Stone's remark to Jordan could not reasonably have affected the decision.

¶ 93 We turn to defendant's final contention on appeal. He requests that, if we affirm his conviction, we correct the judgment order to state that he was convicted under the knowing-murder statutory subsection (720 ILCS 5/9-1(a)(2) (West 2012)) and not the intentional-murder subsection (720 ILCS 5/9-1(a)(1) (West 2012)). We exercise our power to enter any order that the trial court could have entered (see Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994)) and hereby amend the judgment. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 94 The judgment of the circuit court of Lake County is affirmed as modified.

¶ 95 Affirmed as modified.